# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

DAVID DRIESEN; DENISE
DRIESEN,

      Plaintiffs,

vs.

IOWA, CHICAGO & EASTERN
RAILROAD CORPORATION,

      Defendant.

**No. 08-CV-4109-DEO**

**MEMORANDUM OPINION AND ORDER
ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

_____

## I. INTRODUCTION

This matter is before the Court on Defendant Iowa, Chicago & Eastern Railroad Corporation's (hereinafter "Defendant" or "IC&E") motion for summary judgment.

## II. FACTS

The record in this case, when viewed in the light most favorable to the non-moving party, Plaintiffs David and Denise Driesen (hereinafter "Plaintiffs" or "the Driesens"), reveals the following facts:

At 9:00 a.m. on December 18, 2006, IC&E employees Dean Porter, the locomotive engineer, and Kenneth Kisner, the conductor or switch foreman, began work by boarding their train in Spencer, Iowa. Porter and Kisner were responsible for picking up and dropping off loaded railcars in Hartley,

Sheldon, and Sanborn, Iowa.  Porter was responsible for operating the locomotive on December 18, 2006.  Kisner assisted the engineer and was responsible for completing required paperwork and certain ground operations, including diverting tracks and attaching and detaching railcars.[1]

At approximately 8:20 p.m. on December 18, 2006, Porter and Kisner arrived at the Bruening railroad siding, which is located just west of the grade crossing at 180th Avenue in Spencer, Iowa, and runs parallel to the main railroad line.  Trains access the Bruening siding from the main line by two switches located on either end of the siding.  When the IC&E train arrived at the Bruening siding, the train consisted of two locomotives pulling five grain hopper railcars.

At the Bruening siding, Porter and Kisner were charged with picking up nine empty flatcars and attaching them to their train, a process referred to as "switching."  West of 180th Avenue and west of the furthest entrance to the Bruening siding, Kisner cut the grain hopper railcars from the two IC&E locomotives.  Porter then operated the train eastward over the

[1] Both parties agree that at all times relevant to this case, both Porter and Kisner acted within the course and scope of their employment with IC&E.

switch, allowing Kisner to align the switch to facilitate the pick-up of the flat bed railcars waiting on the Bruening siding. With the switch flipped, Porter backed his locomotives into the Bruening siding to couple the engines to the railcars. Once the cars were coupled to the locomotives, Kisner connected the air line between the locomotives and the railcars and proceeded to remove the hand brakes. Kisner then conducted the federally mandated air test of each railcar. After the air test was complete, Porter operated the train eastward, pulling the nine flat bed railcars from the Bruening crossing, through the switch, and over and across the grade crossing at 180th Avenue. Kisner then realigned the switch to the mainline and Porter began shoving the train westward over 180th Avenue.

Around 8:25 p.m. on December 18, 2006, as Porter and Kisner conducted their operations, Rose Fear turned north from County Road B-24 onto 180th Avenue and toward the grade crossing en route to her home. The grade crossing is one-quarter to one-half mile north of the County Road B-24/180th Avenue intersection. As Fear approached the grade crossing, she set her cruise control to approximately 60 miles per hour

and utilized her high-beam headlights.  As she neared the grade crossing, Fear sensed that it was darker than usual, and she picked up a big object in her headlights.  Fear applied her brakes and swerved into the southbound lane, onto the shoulder, and around the flatbed railcars.  Her brakes did not squeal and her anti-lock braking system did not engage.  Fear testified that she did not hear any train whistle or horn.  Fear remembered seeing and knowing the crossbucks were at the crossing.  Fear believed that had she not been able to swerve onto the shoulder and around the railcars, she would have hit the railcars.  After swerving around the train, Fear came to a stop on the north side of the grade crossing where she was able to observe a person at a distance west of the crossing with a flashlight pointing down at the ground.

Porter, who was on board the locomotive, was notified by Kisner over the radio that a vehicle was approaching the crossing "at a pretty good clip," but Porter did not sound the locomotive's horn to notify the oncoming vehicle of the train's presence on the crossing.  Porter then witnessed the

vehicle nearly hit the train.[2]

At approximately 8:50 p.m. on December 18, 2006, Trooper Driesen was driving from his home to the district office in Spencer, Iowa, as he was scheduled to work the midnight shift from 9:30 p.m. to 6:00 a.m. Trooper Driesen turned north on 180th Avenue from County Road B-24. He was not using his computer, phone or other mobile device. He did not recall exactly what speed he was traveling or whether he was using his high beams. The posted speed limit on 180th Avenue is 55 miles per hour. Trooper Driesen stated he usually tried to stay between 55-60 miles per hour, but on a clear night with no snow or other vehicles present, it was not unusual for him to travel at 63 miles per hour. On this particular night, there were no visibility issues relating to fog or precipitation.

Having patrolled this area in the past, Trooper Driesen was familiar not only with the Spencer area, but also with the 180th Avenue grade crossing. As he approached the crossing, he neither saw nor heard any signs of a train, and he saw no

_____

[2] The Driesens argue this was in reference to Fear's approach. IC&E denies it was Fear's vehicle.

people on the ground. At some point, he may have seen white lettering on the train, and he applied his brakes and steered to the left. The railcars were blocking the crossing and he struck a railcar.

At some point prior to the impact, Kisner heard the sound of a car engine and reported to Porter over the radio that a car was approaching the train. Kisner then shouted over the radio that the car was not slowing down and told Porter to put the train into emergency. Porter immediately engaged the train's emergency brake and, from his position in the locomotive, saw Trooper Driesen's car impact the side of the train. Porter immediately dialed 911, and Kisner aided Trooper Driesen until emergency personnel arrived. Deputy Brad Hawley of the Clay County Sheriff's Department was the first to arrive on the scene.

Trooper Driesen struck the third railcar in the train, identified as KRL 70948. The impact caused the patrol vehicle to weld itself to the train, necessitating the power of two wreckers to pull it away.

All of the empty flatcars lacked retro-reflective tape. KRL 70948 did not have significant retro-reflective material

on it on the night of the incident. Both Kisner and Porter had fusees available on the train for their use. Neither Porter nor Kisner flagged the crossing or placed lighted fusees across the grade crossing to warn oncoming motorists of the train's presence in the crossing.

Porter did not sound the locomotive's horn to warn Trooper Driesen of the train's presence on the crossing. Porter testified that he did not want to use the horn because he saw every day where other cars tried to beat him to the crossing; thus, he figured Trooper Driesen would not heed a warning sound.

After the incident, the Iowa State Patrol conducted an investigation. Trooper Robert Subbert, a technical investigator for the Iowa State Patrol, arrived on the scene and began taking photographs and measurements. In taking measurements, Subbert first established a reference point at the east edge of the road at the railroad tracks. Subbert then identified the skid marks extending 121 feet, 8 inches south from his reference point. On December 19, 2006, Subbert returned to the scene in the daylight and identified skid marks of 196 feet, six inches. Using this measurement as well

as the speedometer slap indicating Trooper Driesen was traveling at 48 miles per hour at the time of impact, Subbert concluded that at the time Trooper Driesen applied his brakes, he had been driving at a minimum 63.78 miles per hour. Subbert also determined that a motorist could not see the railcars until they were right up to the train.

Trooper Driesen requested Dennis Skogen, a professional engineer, to provide an expert opinion regarding the speed at which he operated his state patrol vehicle on December 18, 2006. Utilizing Subbert's initial measurement of 121 feet of skid marks, Skogen concluded Trooper Driesen was traveling at a rate between 60-67 miles per hour at the start of his skid. Had Skogen used Subbert's conclusion that there was 196 feet of skid marks, the calculated speed would increase to 69-76 miles per hour. However, Skogen testified that he would not use the alleged 196 feet of skid marks in his calculation because it would have required Trooper Driesen to see and react to the railcar at over 300 feet away, which was farther than the range of his headlights. Pl. App. 200. Skogen also opined that the dark flatcar would not have been visible to Trooper Driesen as he approached the grade crossing.

Trooper Driesen also retained Colon Fulk of Railex, Inc., to provide expert opinions regarding the duties of the railroad in this case. Mr. Fulk produced a report that was highly critical of IC&E and its employees.

The grade crossing on 180th Avenue was a passive crossing,[3] marked with a crossbucks sign, painted pavement markings, and an advanced warning disc. The grade crossing at 180th Avenue has a history of train/automobile collisions.

In October 2005, the State of Iowa, through its Department of Transportation, and IC&E entered into an agreement for the use of federal funding[4] for safety improvements at various IC&E crossing locations, including some in Clay County. Pursuant to the terms of the Agreement, the State agreed to provide federal funding dollars to IC&E

---

[3] Passive warning devices are "those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train." 23 C.F.R. § 646.204. Active warning devices are "those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train." 23 C.F.R. § 646.204.

[4] See 23 U.S.C. § 130

for passive sign improvements, and IC&E agreed to construct the improvements in accordance with Part VIII of the Manual on Uniform Traffic Control Devices on Streets and Highways ("MUTCD"). No Federal funding had yet been expended to pay for the replacement of the existing passive warning devices in place at the 180th Avenue crossing at the time of Driesen's December 18, 2006, accident. New reflectorized crossbucks with additional vertical reflectorized tape on the poles were later installed.

IC&E owned neither the railcar Trooper Driesen struck nor any of the other flat bed railcars the train crew picked up just prior to the collision.

IC&E has adopted and follows the General Code of Operating Rules as a part of its internal rules and regulations.

## III.    LAW AND ANALYSIS

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial.  <u>Greer v. Shoop</u>, 141 F.3d 824, 826 (8th Cir. 1998).  A judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts.

IC&E argues it is entitled to summary judgment as a matter of law for the following reasons:  (1) The Driesens' claims are preempted by federal law; (2) The Driesens are barred from relief because of Trooper Driesen's comparative fault; and (3) Denise Driesen's claims for loss of consortium are barred because she has not shown any proof of damages. The Court will address each argument in turn.

### B.  Federal Preemption

Congress enacted the Federal Railroad Safety Act ("FRSA") to "promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents."  49 U.S.C.

§ 20101. Section 20106 of Title 49 of the United States Code provides for the express preemption of "laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security . . . ." 49 U.S.C. § 20106(a)(1).

The FRSA, however, contains two savings clauses permitting state regulation of railroad safety or security matters. The first savings clause permits a state to "adopt or continue a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). If a federal regulation or order "covers" the subject matter of a State requirement, the second savings clause permits a State to adopt a more stringent law, regulation, or order when the law, regulation, or order -

> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;

>(B) is not incompatible with a law,
regulation, or order of the United States
Government; <u>and</u>

>(C) does not unreasonably burden interstate
commerce.

49 U.S.C. § 20106(a)(2) (emphasis added).  Subsection (b) of

section 20106 provides a clarification regarding state causes

of action and permits such actions alleging that a party has

failed to comply with its own plan, rule, or standard that it

created pursuant to federal regulation or order.

The United States Supreme Court has stated the "FRSA's

preemption provision dictates that, to preempt state law, the

federal regulation must 'cover' the same subject matter, and

not merely 'touch upon' or 'relate to' that subject matter.'"

<u>Norfolk S. Ry. Co. v. Shanklin</u>, 529 U.S. 344, 352 (2000)

(quoting <u>CSX Transp., Inc. v. Easterwood</u>, 507 U.S. 658, 664

(1993)).  In other words, "'preemption will lie only if the

federal regulations substantially subsume the subject matter

of the relevant state law.'"  <u>Id.</u>  Federal regulations need

not be identical to state laws, however.  <u>Lewis v. Norfolk S.

Ry. Co.</u>, 618 F. Supp. 2d 833, 843 (W.D. Tenn. 2008) (citing

CSX Trans., Inc. v. City of Plymouth, 92 F. Supp. 2d 643 (E.D. Mich. 2000), aff'd, 283 F.3d 812, 817 (6th Cir. 2002)).

In this case, IC&E argues that the following claims are preempted:  claims based on the train's presence in the crossing; claims regarding active warning devices; claims relating to railcar reflectorization; and claims relating to the use of the locomotive horn.  Defendant. Br. 10-17, Docket No. 39-17.  The Court will discuss each argument in turn.

**1.  Claims Based on the Train's Presence In The Crossing**

The Driesens allege that IC&E violated section 327G.32 of the Iowa Code[5] and section 7-7-3 of the Spencer City Code[6]

_____

[5]     A railroad corporation or its employees shall not operate a train in such a manner as to prevent vehicular use of a highway, street, or alley for a period of time in excess of ten minutes except in any of the following circumstances:

1. When necessary to comply with signals affecting the safety of the movement of trains.

2. When necessary to avoid striking an object or person on the track.

3. When the train is disabled.

(continued...)

14

(collectively, the "Iowa and Spencer blocked-crossing laws") by blocking the relevant grade crossing longer than permitted by law. IC&E argues the FRSA preempts the Iowa and Spencer blocked-crossing laws because federal regulations governing mandated air brake tests and speed cover the subject matter of the blocked-crossing laws. Additionally, IC&E argues the Iowa and Spencer blocked-crossing laws are inconsistent with the federal regulations and that it could not have complied both with the laws and the mandated air brake tests.

The Court understands the Driesens to argue that the subject matter of the Iowa and Spencer blocked-crossing laws is the amount of time a train may block a crossing. The Driesens further argue that, because no federal regulations

---

[5](...continued)
> 4. When necessary to comply with governmental safety regulations including, but not limited to speed ordinances and speed regulations. . . .

I.C.A. § 327G.32.

[6] "It shall be unlawful for any conductor, engineer or other person, company or corporation to allow any locomotive, car or cars to remain on the track of any railroad in such a manner as to obstruct any street crossing or sidewalk or any part of the public street for a longer period of time than five (5) minutes." Spencer City Code § 7-7-3.

expressly address the amount of time a train may block a crossing, the Iowa and Spencer blocked-crossing laws satisfy the FRSA's first savings clause. Alternatively, the Driesens argue that the laws are not inconsistent with federal regulations and meet the second savings clause.[7]

Neither party appears to dispute that the Iowa and Spencer blocked-crossing laws are "related to" railroad safety, as required to fall within the confines of the express preemption provisions of 49 U.S.C. § 20106. Nevertheless, the Court concludes that laws related to the movement of trains through crossings, including blocked-crossing laws, are "related to" railroad safety. See Vill. of Mundelein v. Wis. Cent. R.R., 882 N.E.2d 544, 550 (Ill. 2008) ("The phrase 'relating to' has been given a broad meaning. . . . The Supreme Court has interpreted that phrase to mean 'having a connection with, or reference to,' a certain subject matter.")

---

[7] Although addressed by neither party, there remains a question as to whether the FRSA savings clause in 49 U.S.C. § 20106(a) applies to municipal or local laws, since the savings clause applies only to a "State . . . law, regulation, or order. . . ." 49 U.S.C. § 20106 (emphasis added). See also CSX Transp., Inc. v. City of Plymouth, Mich., 86 F.3d 626, 628-29 (6th Cir. 1996). As neither law fits within the savings clause in this case, the Court need not answer this question.

(citing <u>Easterwood</u>, 507 U.S. at 664; and <u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 383-84 (1992)).

Both parties, however, dispute the subject matter of the Iowa and Spencer blocked-crossing laws. To resolve this dispute, the Court must determine what the Iowa and Spencer laws actually regulate. <u>City of Plymouth</u>, 92 F. Supp. 2d at 651-53. Most occupied crossing laws, including the Iowa and Spencer laws at issue in this case, apply regardless of whether a train is moving or stopped at a crossing. Additionally, it is well established in the overwhelming majority of federal and state courts to consider the matter that the subject matter of blocked-crossing laws is the movement of trains through grade crossings. <u>See</u> <u>Vill. of Mundelein</u>, 882 N.E.2d at 552; <u>City of Plymouth</u>, 92 F. Supp. 2d at 659; <u>City of Seattle v. Burlington N. R.R. Co.</u>, 41 P.3d 1169, 1174 (Wash. 2002); <u>CSX Transp., Inc. v. City of Mitchell, Ind.</u>, 105 F. Supp. 2d 949, 951-52 (S.D. Ind. 1999); <u>Krentz v. Consol. Rail Corp.</u>, 910 A.2d 20, 32-36 (Pa. 2006). This Court concurs with these courts and concludes the subject matter of Iowa Code § 327G.32 and Spencer City Code § 7-7-3 is the movement of trains through grade crossings.

17

To determine whether federal regulations "cover" the subject matter of the Iowa and Spencer blocked-crossing laws, the Court is mindful that federal regulations need not be identical to the Iowa and Spencer blocked-crossing laws. Lewis, 618 F. Supp. 2d at 843. Additionally, the federal regulations "apply to all track conditions including those at grade crossings." Vill. of Mundelein, 882 N.E.2d at 555-56 (citing Easterwood, 507 U.S. at 675). With these principles in mind, the Court recognizes that federal regulations governing train speed cover the subject matter of blocked-crossing laws because "[t]he amount of time a moving train spends at a grade crossing is mathematically a function of the length of the train and the speed at which the train is traveling." CSX Transp., Inc. v. City of Plymouth, 283 F.3d 812, 817 (6th Cir. 2002); Vill. of Mundelein, 882 N.E.2d at 555 (quoting Plymouth). Stated another way, "the regulation here is a regulation of train speed and length . . . ." Vill. of Mundelein, 882 N.E.2d at 555. As such, federal regulations governing train speed (i.e. 49 C.F.R. §§ 213.9, 213.307, 213.57) substantially subsume, or cover, the subject matter of the movement of trains through crossings. Federal regulations

18

therefore preempt state regulation of train speed. <u>Easterwood</u>, 507 U.S. at 674 (Federal regulations covering train <u>speed</u> preempt additional state regulation); <u>see also</u> <u>S. Pac. Co. v. Arizona</u>, 325 U.S. 761, 775 (1945) (State regulation of a train's <u>length</u> violates the commerce clause).

Additionally, and most relevant to IC&E's preemption argument in this case, federal regulations governing air brake tests restrict the movement of trains until such tests are completed. <u>See</u> 49 C.F.R. §§ 232.201-232.219. In situations where a train must perform switching maneuvers at or near crossings, it must also perform federally mandated air brake inspections and tests before proceeding. 49 C.F.R. § 232.215. Thus, federal regulations governing air brake tests substantially subsume, or cover, the subject matter of the movement of trains through crossings. Iowa Code § 327G.32 and Spencer City Code § 7-7-3 fall under the express preemption provisions of 49 U.S.C. § 20106.

In resisting IC&E's preemption argument regarding the Iowa and Spencer blocked-crossing laws in this case, the Driesens rely almost exclusively on an unpublished decision out of the Southern District of Iowa. <u>See</u> <u>Borwick v. Chicago,</u>

19

Cent. & Pac. R.R. Co., No. 06-CV-13-CFB (S.D. Iowa Oct. 17, 2007). This Court carefully reviewed Borwick, but concludes the facts and reasoning applied in Borwick are wholly distinguishable from the facts in this case. Additionally, the court in Borwick relied on an Illinois state appellate opinion in its findings, an opinion which the Illinois Supreme Court subsequently reversed.

In Borwick, the defendant railroad parked 54 empty railcars at a siding near a Council Bluffs, Iowa, grade crossing. The railcars were attached to each other but not to any locomotive or power support. Later that evening, wind gusts of 62 miles per hour blew the railcars into the crossing, blocking the crossing entirely. The plaintiff, apparently intoxicated, drove his vehicle into one of the railcars.

The plaintiff in Borwick sued the railroad and alleged the railroad was negligent by leaving the railcars in the crossing and blocking the crossing longer than permitted by Iowa Code § 327G.32 and Council Bluffs Municipal Code

§ 8.66.010.[8] The railroad argued the plaintiff's blocked-crossing claims were preempted by the FRSA for similar reasons IC&E alleges here.

The court in Borwick rejected the railroad's preemption arguments as to the FRSA for two primary reasons. First, the court determined that for preemption to apply, "the asserted regulations [i.e. air brake testing regulations] must apply to the asserted claim under the facts of the case. Borwick, at 10 (citing Easterwood, 507 U.S. at 664). The court concluded the railroad did not demonstrate - indeed, did not even contend - that any federal regulations, including the air brake testing regulations, applied to the facts of the case primarily because the train obstructed the crossing due to wind gusts on the night of the accident, but not due to compliance with any federal regulation. Borwick, at 11 (distinguishing Krentz, 910 A.2d at 35-36, in which the railroad blocked the crossing due to the train's length and

---

[8] Section 8.66.010 stated, in part, the following: "A railroad corporation or its employees shall not operate any train in such a manner as to prevent vehicular use of any highway, street, or alley for a period of time in excess of ten (10) minutes, except . . . when necessary to comply with governmental safety regulations including, but not limited to, speed ordinances and speed regulations."

mandatory brake testing on the night the plaintiff struck the train; thus "'whenever. . . the distance between a dead-end spur and a crossing is shorter than the length of the train,' compliance with both the federal brake-testing regulations and the state's anti-blocking statute are impossible.").

Second, the court in <u>Borwick</u> noted that both the state statute and city ordinance contained an exception when necessary to comply with governmental safety regulations. The court cited to <u>Eagle Marine Indus., Inc. v. Union Pac. R.R. Co.</u>, 845 N.E.2d 869 (Ill. App. Ct. 2006) ("<u>Eagle Marine I</u>"), which concluded the railroad did not show that the state's blocked-crossing statute interfered with any safety regulation under the FRSA when the railroad had previously obtained permission to conduct its air brake tests after its trains cleared the crossing, and additionally, the statute provided an exception for a train that could not be moved by reasons or circumstances over which a rail carrier had no reasonable control.

As mentioned, the Illinois Supreme Court subsequently reversed <u>Eagle Marine I</u>. <u>See Eagle Marine Indus., Inc. v. Union Pac. R.R. Co.</u>, 882 N.E.2d 522, 524 (Ill. 2008) ("<u>Eagle</u>

22

Marine II") (holding 49 U.S.C. § 20106 preempted the blocked-crossing ordinance because the ordinance regulated "railroad safety" including the length and speed of trains) (citing Vill. of Mundelein v. Wis. Cent. R.R., 882 N.E.2d 544 (Ill. 2008) (holding same)).  Indeed, the Illinois Supreme Court in Eagle Marine II and Vill. of Mundelein joined the overwhelming majority of courts to hold that the FRSA preempted blocked-crossing laws similar to the laws in this case.

In this case, IC&E was in the process of completing its switching maneuvers and air brake tests when or shortly before the accident occurred.  Thus, unlike in Borwick, IC&E blocked the crossing for reasons related to its switching maneuvers, which triggered federal air brake testing requirements.  As mentioned, the railcars in Borwick blocked the crossing after they were parked and unattached from the locomotive for the night and subsequently blown into the crossing by high winds. Thus, the railcars in Borwick blocked the crossing for reasons wholly unrelated to compliance with federal railroad safety or security requirements.

Although the court in Borwick did not expressly cite to the savings clause when it concluded, citing Eagle Marine I,

that the FRSA did not preempt the state statute and municipal ordinance because they were not incompatible, 49 U.S.C. § 20106 nevertheless mandates this analysis only when considering whether the second savings clause applies. In the second savings clause, a state or local law must satisfy all three prongs of § 20106(a)(2)(A)-(C) to escape preemption when federal law "covers" the subject matter of the state or local law.

In this case, the Court concludes that the Iowa and Spencer blocked-crossing laws do not satisfy at least the first two of three prongs of the second savings clause, at 49 U.S.C. § 20106(a)(2)(A)-(C).[9] First, neither law is necessary to eliminate or reduce an essentially local safety or security hazard, as required to satisfy the first prong of the second savings clause. 49 U.S.C. § 20106(a)(2)(A). Essentially local safety hazards are defined as "local situations which are not statewide in character and not capable of being adequately encompassed within national uniform standards." Duluth, Winnipeg, and Pac. Ry. Co. v. City of Orr, 529 F.3d

---

[9] As all three prongs of the second savings clause are required to survive preemption, the Court need not analyze the applicability of the third prong.

794, 798 (8th Cir. 2008) (quoting <u>Nat'l Ass'n of Regulatory</u>

<u>Utils. Comm'rs v. Coleman</u>, 542 F.2d 11, 14-15 (3d Cir. 1976)).

The legislative history further supports this definition:

> 'The purpose of [the savings clause] is to enable the states to respond to local situations not capable of being adequately encompassed within the uniform national standards. . . . Since these local hazards would not be statewide in character, there is no intent to permit a state to establish statewide standards superimposed on national standards covering the same subject matter.'

<u>Duluth, Winnipeg, and Pac. Ry. Co.</u>, 529 F.3d at 798 (quoting

H.R. Rep. No. 91-1194, at 11 (1970), reprinted at 1970

U.S.C.C.A.N. 4104, 4117)). Thus, "[i]f the local situation is

actually statewide in character <u>or</u> capable of being adequately

encompassed within national uniform standards, it will not be

considered an essentially local safety hazard." <u>Duluth,</u>

<u>Winnipeg, and Pac. Ry. Co.</u>, 529 F.3d at 798.

As mentioned, the Iowa and Spencer blocked-crossing laws

cover the subject matter of the movement of trains through

railroad crossings. Railroad crossings exist statewide, as

does the possibility that trains might block such crossings.

Thus, the Iowa and Spencer blocked-crossing laws address

situations which are statewide in character. Additionally,

25

the Iowa statute applies statewide, which undermines any argument that it exists to eliminate or reduce an essentially local safety hazard. See City of Plymouth, 92 F. Supp. 2d at 657 ("Where a state law has general, statewide applicability, it is not considered to eliminate or reduce an essentially local safety hazard."). Finally, the conditions at the crossing in this case were not unique to the locality and could be encompassed within national uniform standards. Thus, the Iowa and Spencer blocked-crossing laws do not satisfy the first prong of the second savings clause.

Moreover, the Court concludes the Iowa and Spencer blocked-crossing laws are not compatible with federal railroad safety regulations, as required to satisfy the second prong of the second savings clause. 49 U.S.C. § 20106(a)(2)(B). While Iowa Code § 327G.32 excepts a railroad from complying with the blocked-crossing statute so long as the railroad acts in compliance with federal safety regulations, the statute and federal regulations are nevertheless incompatible.[10]

_____

[10] Spencer City Code § 7-7-3 does not similarly contain an exception for actions performed in compliance with federal law; thus, in situations similar to the facts in this case, the Spencer code would undoubtedly conflict with federal (continued...)

Practically speaking, the exception in Iowa Code § 327G.32 places onerous burdens on railroads to document or prove every test or step they take in compliance with federal law, even when federal law does not mandate them to do so.  See City of Plymouth, 92 F. Supp. 2d at 656-57.  In Plymouth, the plaintiff railroad was repeatedly fined for violating the Michigan state blocked-crossing statute.[11]  The railroad sought declaratory relief that the FRSA preempted the statute. The defendant argued that the blocked-crossing statute's exception, which permitted trains to block crossings due to an "unsafe condition," applied to the railroad's air brake tests mandated by federal regulations.  Rejecting this argument, the court determined that the exception -

> has the effect of regulating the
> performance of the air brake tests because
> it would require [the railroad] to keep a
> detailed record of when and where the tests
> are performed so that it may escape
> liability. . . .  The federal regulations
> do not currently require [the railroad] to

_____

[10](...continued)
regulations governing air brake tests.

[11] Mich. Comp. Laws Ann. § 462.391.  See also Plymouth, 86 F.3d 626 (6th Cir. 1996) (affirming the district court's finding that the FRSA preempted the City of Plymouth blocked-crossing ordinance).

> keep such a log. To the extent that the
> statute operates to regulate the
> performance of federally-mandated air brake
> testing, it is preempted by the FRSA.

Plymouth, 92 F. Supp. 2d at 656-57. Thus, even though exceptions to the blocked-crossing statute may exist, they are not necessarily compatible with federal regulations, as discussed herein. The Court finds the reasoning of Plymouth persuasive and concludes that Iowa Code § 327G.32 and Spencer City Code § 7-7-3 are not compatible with federal regulations governing air brake tests and do not satisfy the second prong of the second savings clause.

For these reasons, the Court concludes federal regulations governing the movement of trains, particularly as they pertain to air brake testing requirements in this case, preempt Iowa Code § 327G.32 and Spencer City Code § 7-7-3.[12] Additionally, neither of the laws fall within the savings clauses of 49 U.S.C. § 20106. IC&E's motion for summary

---

[12] To be clear, the Court is not invalidating the Iowa and Spencer blocked-crossing laws, but is only concluding the laws are preempted as applied to the facts of this particular case.

judgment as to the Driesens' blocked-crossing claims will be granted.[13]

## 2. Claims Relating to Reflectorization of Railcars

The Driesens concede that federal law preempts all claims relating to whether the railcars were or should have been reflectorized. Pl. Br. 12, Docket No. 40-4, at 14. <u>See also</u> 49 C.F.R. § 224 <u>et. seq.</u> (specifying the type of retroreflective material and the location at which it is to be applied to railcars). IC&E's motion for summary judgment as to this issue will be granted.

## 3. Claims Relating to Active/Passive Warning Devices

The passive warning devices at the 180th Avenue grade crossing were scheduled to undergo improvements. Specifically, the State of Iowa and IC&E entered an agreement to use federal funding for passive sign improvements,

---

[13] Because the Court concludes the FRSA preempts Iowa Code § 327G.32 and Spencer City Code § 7-7-3 only as applied to the facts of this particular case, the Court need not address the preemptive effects of the Interstate Commerce Commission Termination Act.

including new crossbucks and reflective tape. At the time of Trooper Driesen's accident, the agreement to install such improvements existed, but the improvements were not physically installed or operating. IC&E nevertheless maintains that federal law preempts any claims relating to the warning devices.

"'A railroad's common-law duty of care continues until the federally prescribed [warning] devices are actually installed and operating.'" Kiemele v. Soo Line R.R. Co., 93 F.3d 472, 476 (8th Cir. 1996) (quoting Elrod v. Burlington N. R.R. Co., 68 F.3d 241, 244 (8th Cir. 1995)). "After federally funded warning devices are installed and operating, federal preemption occurs." Id. Additionally, "federal preemption does not occur when funds are designated, but only when the planned devices are installed and operative." Bryan v. Norfolk & W. Ry. Co., 154 F.3d 899, 903 (8th Cir. 1998) (citing St. Louis Sw. Ry. Co. v. Malone Freight Lines, Inc., 39 F.3d 864, 867 (8th Cir. 1994)); see also Shanklin, 529 U.S. at 354 ("[O]nce the FHWA has funded the crossing improvement and the warning devices are actually installed and operating, [federal regulations] 'displace state and private

decisionmaking authority by establishing a federal law requirement that certain protective devices be installed or federal approval obtained.'" (quoting <u>Easterwood</u>, 507 U.S. at 670)).

IC&E argues federal law preempts the Driesens' inadequate warning device claims because federal funds participated in the installation of the passive warning device improvements even though the improvements were not physically installed or operating at the time of the accident. This argument is contrary to Eighth Circuit and Supreme Court precedent. The above-cited cases reveal that federal preemption does not occur until warning devices installed with federal funds are physically installed and operating. The parties do not dispute the improvements were not physically installed or operating at the time of Trooper Driesen's accident. Thus, federal law does not preempt the Driesens' warning device claims.

Moreover, no federal preemption of inadequate warning device claims occurs in cases in which an issue of fact exists as to whether the crossbucks were operating. <u>Kiemele</u>, 93 F.3d at 476. Crossbucks are not "operating" if they lose their

reflectivity.  Id.  A question of fact exists as to whether the crossbucks in this case lost their reflectivity, and thus, were "operating" at the time of Trooper Driesen's accident. IC&E's motion for summary judgment as to this issue will be denied.

### 4. Claims Relating to the Use of the Locomotive's Horn

IC&E argues the Driesens' claims relating to IC&E's duty to sound the locomotive horn are preempted pursuant to 49 C.F.R. § 222.1 et. seq.  The Driesens do not appear to dispute that such claims might generally be preempted, but argue that the claims should proceed because Trooper Driesen's quick approach to the crossing constituted a "specific, individual hazard."  Thus, the Driesens argue federal preemption does not occur.  IC&E, in response, argues only that Trooper Driesen's approach was not a "specific, individual hazard" and that the Driesens' claim is preempted.

In Easterwood, the Supreme Court held that federal speed regulations preempted state tort claims that a railroad negligently operated a train at an excessive speed.  The Court, however, recognized in a footnote that tort law duties

32

relating to speed "such as the duty to slow or stop a train to avoid a specific, individual hazard" may not be preempted. Easterwood, 507 U.S. at 675 n.15; Myers v. Mo. Pac. R.R. Co., 52 P.3d 1014, 1027 (Okla. 2002). "A 'specific, individual hazard' is not to be confused with the statutory 'essentially local safety hazard' set forth in 49 U.S.C. § 20106." Stevenson v. Union Pac. R.R. Co., 110 F. Supp. 2d 1086, 1088-89 (E.D. Ark. 2000). An example of a "specific, individual hazard" is a child standing on the tracks[14] or a motorist stranded on the tracks.[15]

Additionally, a specific, individual hazard might include the unwavering approach of a vehicle to a railroad crossing. Alcorn v. Union Pac. R.R. Co., 50 S.W.3d 226, 242 (Mo. 2001); but see Liboy v. Rogero, 363 F. Supp. 2d 1332, 1340-41 n.10 (M.D. Fla. 2005) (noting that the approach of an automobile to a crossing was an everyday occurrence and was not a specific, individual hazard). However, the train crew must know or should know by reason of the vehicle's "unwavering approach"

---

[14] Bashir v. Nat'l R.R. Passenger Corp., 929 F. Supp. 404, 412 (S.D. Fla. 1996).

[15] Shaup v. Frederickson, 1998 WL 726650 (E.D. Pa. Oct. 16, 1998).

to the crossing that a collision is imminent. <u>Alcorn</u>, 50 S.W.3d at 242 (if a "train crew knew or should have known, by reason of [a vehicle's] 'unwavering approach,' that a collision was imminent," the unwavering approach of the vehicle constitutes a specific, individual hazard, which imposes a duty to slow or stop the train to avoid the collision, and the duty is not preempted by the federal regulations governing train speed). In sum, a specific, individual hazard is a "unique occurrence that could cause an accident to be imminent rather than a generally dangerous condition." <u>Woods v. CSX Transp., Inc.</u>, 2008 WL 5070352, *6 (N.D. Ind. Nov. 24, 2008).

This Court is not persuaded the "specific, individual hazard" exception as set out in <u>Easterwood</u> applies to the Driesens' claim that IC&E negligently failed to sound the locomotive's horn in this case. By the plain text of the Court's decision in <u>Easterwood</u>, the common law tort duty must be "related" to an "excessive speed claim," "such as the duty to slow or stop a train to avoid a specific, individual hazard." <u>Easterwood</u>, 507 U.S. at 675 n.15. At least one court has expressly stated that the "specific, individual

hazard" exception "applies <u>only</u> where the plaintiff asserts that the railroad was negligent in failing to slow or stop a train." <u>Bouchard v. CSX Transp., Inc.</u>, 196 Fed. Appx. 65, 72 (3d Cir. 2006) (unpublished) (emphasis added) (citing <u>Easterwood</u>, 507 U.S. at 675 n.15). While this Court might not limit the "specific, individual hazard" exception so narrowly, the Court notes that the majority of cases it found discussing this exception, and every authority the Driesens cited to support their argument in this case, involved a train's failure to slow or stop to avoid such a hazard. <u>See</u> <u>O'Bannon v. Union Pac. R.R. Co.</u>, 960 F. Supp. 1411, 1420 (W.D. Mo. 1997); <u>Bashir v. Nat'l R.R. Passenger Corp.</u>, 929 F. Supp. 404, 412 (S.D. Fla. 1996); <u>Peters v. Union Pac. R.R. Co.</u>, 455 F. Supp. 2d 998, 1003 (W.D. Mo. 2006); <u>Alcorn</u>, 50 S.W.3d at 242; <u>Anderson v. Wis. Cent. Transp. Co.</u>, 327 F. Supp. 2d 969, 977 (E.D. Wis. 2004); <u>Griffin v. Kan. City S. Ry. Co.</u>, 965 S.W.2d 458, 461 (Mo. Ct. App. 1998); <u>Cent. of Ga. R.R. Co. v. Markert</u>, 410 S.E.2d 437, 439 (Ga. Ct. App. 1991).

The Driesens claim IC&E was negligent by failing to sound the locomotive's horn when Trooper Driesen approached the crossing. This claim is related to IC&E's alleged failure to

warn of its presence.  A failure to warn claim is not related to a speed claim "such as the duty to slow or stop a train to avoid a specific, individual hazard."  The Driesens have made no claim regarding the train's duty to slow or stop to avoid a collision.  Indeed, the train was apparently moving quite slowly when Trooper Driesen approached the crossing, and the locomotive had already passed through the crossing at the time of the accident.  IC&E could not have possibly adjusted its speed to avoid the accident.

While some courts have analyzed the "specific, individual hazard" exception and have held that a train must take any additional preventative measures it can to avoid a collision, the duty was in addition to a duty to slow or stop the train. See, e.g., Alcorn, 50 S.W.2d at 242 (A specific individual hazard "requires the train's crew either to slow the train or stop, in addition to any other preventive measures it can take, to avoid the collision.").  As mentioned, this was not the situation here.  IC&E could not have possibly avoided the accident by adjusting its speed in response to Trooper Driesen's approach.  The evidence, however, shows that IC&E's engineer engaged the train's emergency brakes just prior to

the accident, although the effects this action had on the severity of the accident or Trooper Driesen's injuries are unknown.

While the Court is not persuaded the "specific, individual hazard" exception applies as to IC&E's duty to sound the locomotive's horn in this case, the Driesens also alleged in their brief and at oral arguments that the crossbucks were not operating on the night of the accident because they lost their reflectivity. Pl. Br. 18.[16] A claim for failure to sound the horn would more appropriately exist in this case as a failure to warn oncoming motorists of defective warning devices. See Michael v. Norfolk S. Ry. Co.,

---

[16] Even the crossbucks had lost their reflectivity. In spite of these facts the railroad employees failed to flag or light up the crossing with fusees. After the two employees witnessed Rose Fear nearly collide with their train, they still took no additional action to warn the oncoming motorists. Engineer Porter said that he saw Trooper Driesen's vehicle approach the crossing. He knew that he could have sounded the locomotive's horn as a warning to the plaintiff, but refused to do so because he felt that the Trooper would try to beat his train.

Pl. Br. 18.

74 F.3d 271, 273 (11th Cir. 1996).  Thus, this Court will permit the Driesens to raise their failure to sound the horn claim only as it relates to IC&E's alleged failure to warn motorists of the defective nature of the warning devices.

**5. Whether a Violation of IC&E's Own Operating Rules Saves the Driesens from Preemption**

The Driesens alternatively argue that its claims are not subject to preemption because IC&E failed to comply with the IC&E Safety and General Rules for the Transportation Department and the General Code of Operating Rules 5.8.1 and 5.8.2 when engineer Porter failed to sound the locomotive's horn to provide an audible warning to Trooper Driesen.  <u>See</u> 49 U.S.C. § 20106(b)(1)(B) (stating "[n]othing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party . . . has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries. . ."). The Court need only review whether these rules were created pursuant to federal regulation.  It is simply not sufficient to allege a violation of IC&E's own rules.  <u>Murrell</u>

<u>v. Union Pac. R.R. Co.</u>, 544 F. Supp. 2d 1138, 1149-50 (D. Or. 2008). The Driesens do not cite to any federal regulation mandating these internal rules. Thus, the Driesens' argument that IC&E failed to comply with the IC&E Safety and General Rules for the Transportation Department and the General Code of Operating Rules 5.8.1 and 5.8.2 do not save them from otherwise preempted claims. As previously mentioned, however, claims relating to IC&E's failure to warn of defective warning devices may proceed.

### C. Comparative Fault

Citing to Iowa Code § 668.3, IC&E argues Trooper Driesen was comparatively negligent in part because he exceeded the posted speed limit. Thus, IC&E argues Iowa Code § 668.3 bars Trooper Driesen from relief in this case.

Iowa Code § 668.3 provides that contributory fault does not bar recovery unless the claimant bears a greater percentage of fault than the defendant. Thus, mere contributory negligence does not bar recovery for the Driesens.

Additionally, questions of proximate cause and contributory negligence are ordinarily for the jury. <u>Johnson</u>

39

v. Interstate Power Co., 481 N.W.2d 310, 324 (Iowa 1992).  A

party establishes proximate cause as a matter of law only in

rare cases.  Id. (citing Iowa R. App. P. 14(f)(10)).  "This is

especially true in light of Iowa's comparative fault law under

which a plaintiff can still recover even though the plaintiff

may be found to be responsible for fifty percent of the fault

that caused the accident."  Johnson, 481 N.W.2d at 324 (citing

Iowa Code § 668.3).

The undisputed facts of this case are not sufficient for

this Court to conclude as a matter of law that Trooper

Driesen's contributory negligence was greater than 50% in this

case.  The Court is persuaded this is an appropriate question

for the jury.  IC&E's motion for summary judgment as to this

issue will be denied.

### D. Denise Driesen's Loss of Consortium Claim

IC&E argues that Denise Driesen fails to state a

cognizable loss of consortium claim because she provides no

evidence of damages.  IC&E cites to the following

interrogatory completed by Mrs. Driesen to support its

argument:

**INTERROGATORY NO. 20:** If you suffered general damages as a result of the accident, such as loss of your husband's care, comfort, society, and consortium, state the total amount of damages you are claiming in this action, setting forth, with particularity, the nature of each such item of damages and the specific amount claimed. If you are making a claim for special damages, identify any item or damage including medical bills, hospital bills or others, that have been paid by an insurance carrier, public funds or source other than your personal assets. State the party or institution making payment, the dates of payment, and the amount paid.

**ANSWER:** None.

Denise Driesen, Answer to Interrogatory No. 20, Pl. App. 256.

A person seeking a spousal consortium claim must prove he or she suffered damages in an ascertainable amount. <u>Brunson v. Winter</u>, 443 N.W.2d 717, 720 (Iowa 1989). Consortium claims, however, "embrace both tangible and intangible elements." <u>Spaur v. Owens-Corning Fiberglas Corp.</u>, 510 N.W.2d 854, 869 (Iowa 1994) (citing <u>Madison v. Colby</u>, 348 N.W.2d 202, 208 (Iowa 1984)). "Damages for consortium compensate 'for the loss of such intangible elements as company, cooperation, affection and aid.'" <u>Spaur</u>, 510 N.W.2d at 869 (quoting <u>Fuller v. Buhrow</u>, 292 N.W.2d 672, 675 (Iowa 1980)).

While Mrs. Driesen responded "none" to the question of damages, she discussed in a number of other interrogatories the loss of her husband's services and companionship. She stated that for approximately a year and a half following the accident, Trooper Driesen "was not able to do any type of household chores, yard work, home improvement, child care . . . and cook." Interrogatory No. 3, Pl. App. 240. As a result of the accident, Mrs. Driesen stated she "had to assume all the household and child raising duties for well over a year" and that she "was a single parent for a long time after David's accident." Interrogatory No. 6, Pl. App. 243. Mrs. Driesen explained that she was filled with stress and worry after the accident, although she did not seek treatment (Interrogatory No. 8, Pl. App. 245), and that she also experienced anxiety and sleepless nights. Interrogatory No. 11, Pl. App. 248. Mrs. Driesen summarized the basis for her claim as follows:

> I will continue to suffer a loss of my
> husband's care, comfort, society and
> consortium in the future because physically
> David will never be the same. Prior to the
> accident we enjoyed being physically active
> with each other. We did everything
> together as far as recreational activities
> and social activities. We were a team

taking care of the household chores and
raising our children. We can no longer do
the things we loved doing with each other;
walking, jogging, biking, weight lifting,
working out, playing sports with the kids.
David also took care of all the yard work
and the house repairs. He is no longer
able to do the work and repairs without
suffering pain as a result of doing them.
It takes David much longer to do those
things because he has to take a break
because he is physically not able to do
them as easily and it causes him pain.

Interrogatory No. 19, Pl. App. 255.

The Court will permit Mrs. Driesen to raise her
consortium claim at trial, as it cannot find that she failed
to state a claim for damages given her overall responses to
the interrogatories. Thus, IC&E's motion for summary judgment
as to Mrs. Driesen's consortium claim will be denied.

**IV. CONCLUSION**

For the reasons stated herein and consistent with the
Court's findings in this memorandum opinion and order, the
Court hereby finds as follows:

**(1)** IC&E's motion for summary judgment as to the
Driesens' claims relating to the train's blocking of the

crossing, as discussed in Section III(B)(1) of this order at pages 14-29, is **granted.**

**(2)** IC&E's motion for summary judgment as to the Driesens' claims relating to the reflectorization of railcars, as discussed in Section III(B)(2) of this order at page 29, is **granted.**

**(3)** IC&E's motion for summary judgment as to the Driesens' claims relating to inadequate warning devices, including the duty to warn of the failure of such devices, as discussed in Sections III(B)(3)-(4) of this order at pages 29-38, is **denied.**

**(4)** IC&E's motion for summary judgment as to David Driesen's comparative negligence, as discussed in Section III(C) of this order at pages 39-40, is **denied.**

**(5)** IC&E's motion for summary judgment as to Denise Driesen's consortium claim, as discussed in Section III(D) of this order at pages 40-43, is **denied.**

**(6)** IC&E's motion for summary judgment as to all remaining claims not addressed in IC&E's motion, is **denied.**

**IT IS THEREFORE HEREBY ORDERED** that Defendant IC&E's motion for summary judgment, Docket No. 39, is **granted in part/denied in part**.

**IT IS SO ORDERED** this 15th day of February, 2011.

Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa